

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-25-00569-CV

_____

UNIVERSITY OF TEXAS AT ARLINGTON, Appellant

V.

GRACE ESIMAI, Appellee

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-348247-23

Before Kerr, Birdwell, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Before the COVID-19 pandemic, Appellee Dr. Grace Esimai, a professor at Appellant, the University of Texas at Arlington (UTA), had always taught her classes in person. During the spring 2020 semester—at the onset of the global pandemic's uncertainties—UTA temporarily adjusted to online-only classrooms.

In fall 2021, the university began transitioning back to in-person instruction. Although Dr. Esimai started that semester teaching in person, she asked permission to switch back to remote teaching because of her age and health issues. For that semester and spring 2022—as UTA implemented various COVID-19 precautions preparing for its eventual return to full in-person learning—UTA allowed her to teach remotely.

By fall 2022, UTA had fully resumed its traditional in-person classroom model and ended all remote options for the department in which Dr. Esimai taught. She again asked to teach remotely because of her age and health issues. In response, UTA proposed other accommodations to enable her to teach in person, but Dr. Esimai would not agree to teach in person, so UTA did not renew her contract.

Dr. Esimai sued UTA for disability discrimination and its failure to accommodate her request to continue teaching remotely.[1] Asserting a

---

[1]She initially pleaded a retaliation claim, but she abandoned it. *See* Tex. R. Civ. P. 165; *Evans Res., L.P. v. Diamondback E&P, LLC*, 725 S.W.3d 718, 740 (Tex. App.—Eastland 2025, no pet.); *Pruitt v. Int'l Ass'n of Fire Fighters*, 366 S.W.3d 740, 747 (Tex. App.—Texarkana 2012, no pet.).

sovereign-immunity defense, UTA filed a plea to the jurisdiction and motion for summary judgment (the Motion). The trial court denied the Motion, and UTA appealed, raising three issues, the first of which is dispositive: When Dr. Esimai stated that she was unable to resume teaching in person after UTA's ending its temporary COVID-19 online instruction, was she thus unqualified for the position of teaching in-person classes? Because Dr. Esimai did not carry her burden to show that she was qualified, we hold that the trial court erred by denying UTA's Motion. We will reverse and render.

## I. Background

Dr. Esimai taught at UTA from 1996 through her retirement in 2017. In 2019, she discussed returning to teach at UTA with Dr. Radha Mahapatra, the Chair of UTA's College of Business's Information Systems and Operations Management Department. Upon Dr. Mahapatra's recommendation, UTA hired Dr. Esimai as a non-tenure-track adjunct professor for the 2019 summer session. Dr. Esimai taught statistics that semester and during the 2019–2020 academic year on a one-year contract. She worked under similar contracts for the 2020–2021 and 2021–2022 academic years and the 2020 and 2021 summers.

Before the spring 2020 semester, Dr. Esimai had always taught her courses in person, and she had never taught an online course. But when the COVID-19 pandemic first impacted UTA, it mid-semester moved all its classes

online. Then, for the summer 2020, fall 2020, and spring 2021 semesters, UTA used online-only classrooms, and Dr. Esimai taught her courses remotely.

By summer 2021, UTA began having its employees return to working on campus and provided them various health-and-safety guidance. And at some point, UTA announced that for fall 2021, it was resuming in-person instruction with various COVID-19 precautions in place so that its students could also return to on-campus learning.[2]

Dr. Esimai began fall 2021 teaching in person, but mid-semester, she and two other professors requested accommodations to teach remotely from their homes. Dr. Esimai's request indicated that "[d]ue to increased of [sic] immunocompromised state due to other illness, it would be difficult to lecture in a class of closed setting due to increased risk of disease spread." UTA allowed her and the other two professors to teach remotely through December 2021.

The three professors made the same request for spring 2022, and UTA approved their requests "on a temporary basis" through May 15, 2022. Concerning Dr. Esimai's approved request, a UTA leave manager later stated that the "decision was made in part because of the unique circumstances of the COVID-19 pandemic"

---

[2]Among the precautions, UTA encouraged vaccination, implemented testing-and-reporting protocols, required students and faculty to isolate when they tested positive for COVID-19, and required isolating faculty to temporarily teach remotely before returning to in-person instruction.

and without much communication with Dr. Mahapatra's department regarding "what Dr. Esimai's essential job functions were."

At some point, UTA decided to return all classes to the same in-person format as existed before the COVID-19 pandemic, and Dr. Mahapatra informed Dr. Esimai that UTA planned to offer its business statistics classes in person. He initially recommended that she teach in person because she was "more effective as a teacher" when teaching in person based on her student feedback surveys, but he also told her that he would not object if UTA's Human Resources Department approved any further request to teach remotely.

Before Dr. Mahapatra's sending a renewal contract for the 2022–2023 academic year, he had wanted to confirm that Dr. Esimai could teach in person. His assistant, however, erroneously created a contract for him to sign, which he did, and they prematurely sent it to Dr. Esimai. Dr. Mahapatra quickly realized this and asked his assistant to rescind the contract, which she did. Upon his follow-up with Dr. Esimai, "she expressed to [him] that she would not be able to teach in person." Consequently, Dr. Mahapatra notified Dr. Esimai that UTA would not agree to renew her to teach that academic year.

The next day, Dr. Mahapatra learned that Dr. Esimai had previously—and unbeknownst to him—requested another accommodation from UTA's Human Resources Department, asking to teach remotely. In her request, Dr. Esimai stated that the nature of her impairment was "[c]ardiac function impairment, osteoarthritis

5

of joints, leg edema from combination of venous stasis and cardiac dysfunction after prolonged standing, advanced age, significant past history of malignancies (survived), [and] immunocompromised status secondary to aforementioned conditions." In later deposition testimony, Dr. Esimai acknowledged that she had suffered from these problems before the COVID-19 pandemic—when she taught in person—but she said that her conditions had "worse[ned] over the years." Upon a doctor's recommendation, she had requested that UTA permit her "to teach and interact with her students [v]irtually or [r]emotely indefinitely."

When UTA evaluated this accommodation request—distinct from the first two, which it granted primarily because of the temporary COVID-19–related suspension of in-person instruction—it concluded that in-person teaching was an essential function of her position and informed her of that determination. UTA suggested various other accommodations to enable her to teach in person, such as allowing her to sit while teaching because of her difficulty in standing and providing bathroom breaks between classes for age-related bladder-control issues. But the only accommodation Dr. Esimai would accept was teaching remotely from her home; UTA denied that request.[3]

Consequently, Dr. Esimai sued UTA under state law for disability discrimination and its failure to accommodate her. UTA filed the Motion and among

---

[3]UTA also denied similar requests from the other two professors.

other grounds argued that both of Dr. Esimai's claims failed because teaching in person was an essential function of her job and the evidence demonstrated that she could not teach in person, so she had not carried her burden to show that she was qualified for her in-person teaching position. Upon considering the parties' evidence and hearing their arguments, the trial court denied the Motion.

## II. Standard of Review

A court may not decide a case unless it has subject matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (op. on reh'g). Because of sovereign immunity, courts lack subject-matter jurisdiction in lawsuits against the state unless the state consents to suit. *Id.* As a state agency, UTA is thus immune from suit unless the legislature has expressly waived its sovereign immunity. *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009); *Ho v. Univ. of Tex. at Arlington*, 984 S.W.2d 672, 682 (Tex. App.—Amarillo 1998, pet. denied); *Courtney v. Univ. of Tex. Sys.*, 806 S.W.2d 277, 281 (Tex. App.—Fort Worth 1991, writ denied); *see also* Tex. Educ. Code Ann. §§ 65.02, 68.01–.21.

"A plaintiff has the burden to affirmatively demonstrate the trial court's jurisdiction." *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (citing *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012)). When a plaintiff sues a state agency, she must allege facts that fall within a legislative waiver of immunity. *Id.* (citing *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)). A state agency may challenge the trial court's jurisdiction by attacking the plaintiff's pleadings, the

existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018); *see also City of Austin v. Powell*, 704 S.W.3d 437, 448 (Tex. 2024) ("Whatever the government may call its jurisdictional challenge—a plea to the jurisdiction, a motion to dismiss, or a motion for summary judgment—we look to its substance.").

When a defendant challenges the existence of jurisdictional facts, as UTA has done here, the analysis "mirrors that of a traditional summary judgment." *Tex. Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (quoting *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012)). If the defendant challenges a plaintiff's factual allegations with supporting evidence, to avoid dismissal a plaintiff must raise at least a genuine issue of material fact to overcome the jurisdictional challenge. *Alamo Heights*, 544 S.W.3d at 771 (citing *Miranda*, 133 S.W.3d at 221). We must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.* We review de novo a trial court's jurisdictional ruling. *Miranda*, 133 S.W.3d at 226.

### III. Discussion

On appeal, UTA asserts in its first issue that Dr. Esimai failed to establish a prima facie case of disability discrimination or the failure to accommodate her because she did not show that she was qualified for the in-person teaching position. We agree.

## A.  Applicable Law

In prohibiting disability discrimination and requiring reasonable workplace accommodations, *see* Tex. Lab. Code Ann. §§ 21.051, 21.105, 21.128, the Texas Commission on Human Rights Act (TCHRA) waives immunity from suit "for statutory violations," *Alamo Heights*, 544 S.W.3d at 763; *Garcia*, 372 S.W.3d at 636. In a suit against a governmental employer like UTA, the plaintiff's prima facie case implicates both the merits of the claim and the court's jurisdiction because of the doctrine of sovereign immunity. *See Garcia*, 372 S.W.3d at 635–36. And because the TCHRA expressly "provide[s] for the execution of the policies of Title VII of the Civil Rights Act of 1964," Tex. Lab. Code Ann. § 21.001(1), and "the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments (42 U.S.C. Section 12101 et seq.) [ADA]," *id.* § 21.001(3), the Texas Supreme Court has "held that those analogous federal statutes and the cases interpreting them guide our reading of the TCHRA," *Garcia*, 372 S.W.3d at 633–34; *see also Alamo Heights*, 544 S.W.3d at 781–82 (noting that Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes in TCHRA discrimination cases).

### 1. Disability discrimination

The TCHRA prohibits discrimination that occurs "because of or on the basis of a physical or mental condition that does not impair an individual's ability to reasonably perform a job." Tex. Lab. Code Ann. § 21.105. To establish a prima facie

9

case of disability discrimination, a plaintiff must show that the plaintiff (1) had a disability, (2) was qualified for the job, and (3) suffered an adverse employment decision because of the disability. *Lara*, 625 S.W.3d at 61 (citing *Green v. Dall. Cnty. Schs.*, 537 S.W.3d 501, 503 (Tex. 2017) (per curiam)); *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 436 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Because "direct evidence of discriminatory intent is typically 'hard to come by,'" a plaintiff may rely on either direct or circumstantial evidence to establish a prima facie case of unlawful discrimination. *Tex. Tech Univ. Health Scis. Ctr. El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (quoting *Garcia*, 372 S.W.3d at 634). When a plaintiff relies on circumstantial evidence to establish a prima facie discrimination claim, as is the case here, we follow the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26 (1973). *Flores*, 612 S.W.3d at 305. Under that framework, (1) the plaintiff must first create a presumption of illegal discrimination by establishing a prima facie case; (2) the defendant must then rebut that presumption by establishing a legitimate, non-discriminatory reason for the adverse employment action; and (3) the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a pretext. *Id.*

10

## 2. Failure to accommodate

An employer may also violate the TCHRA if it "fail[s] or refuse[s] to make a reasonable workplace accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability who is an employee." Tex. Lab. Code Ann. § 21.128(a); *Harris Ctr. for Mental Health & IDD v. McLeod*, No. 01-22-00947-CV, 2024 WL 1383271, at *8 (Tex. App.—Houston [1st Dist.] Apr. 2, 2024, pet. denied) (mem. op.). An employee has a right to request a reasonable accommodation, but she is not entitled to her preferred accommodation. *Univ. of Tex. at San Antonio v. Wilkerson*, No. 13-24-00021-CV, 2026 WL 202566, at *10 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2026, no pet. h.) (mem. op.); *Hagood v. County of El Paso*, 408 S.W.3d 515, 525 (Tex. App.—El Paso 2013, no pet.).

The prima facie elements of a failure-to-accommodate claim overlap with those of a disability-discrimination claim. *Tex. State Tech. Coll. Sys. v. Donavan*, No. 09-24-00169-CV, 2025 WL 1403562, at *14 (Tex. App.—Beaumont May 15, 2025, pet. denied) (mem. op.) (first citing *Tex. Health & Hum. Servs. Comm'n v. Mitchell*, No. 03-22-00665-CV, 2024 WL 4629162, at *14 (Tex. App.—Austin Oct. 31, 2024, pet. denied) (mem. op.); and then citing *Tex. Dep't of Fam. & Prot. Servs. v. Howard*, 429 S.W.3d 782, 789 (Tex. App.—Dallas 2014, pet. denied)). An employee must establish that (1) she has a "disability," (2) the employer had notice of the disability, (3) the employee could perform the "essential functions" of the position with "reasonable accommodations," and (4) the employer refused to make such

11

accommodations. *Id.* (first citing *Mitchell*, 2024 WL 4629162, at \*14; and then citing *El Paso Cnty. Water Improvement Dist. No. 1 v. Trevizo*, 697 S.W.3d 259, 276 (Tex. App.—El Paso 2023, no pet.)). Unlike for disability-discrimination claims, "the *McDonnell Douglas* burden-shifting test does not apply to a claim that the employer has failed to make a reasonable accommodation." *Davis v. City of Grapevine*, 188 S.W.3d 748, 759 (Tex. App.—Fort Worth 2006, pet. denied), *abrogated on other grounds by Lujan v. Navistar, Inc.*, 555 S.W.3d 79 (Tex. 2018).

### 3. Job qualifications and essential job functions

Concerning both claims, the key issue in this case is whether Dr. Esimai was qualified—that is, whether she could perform the "essential functions" of her job. *See Lara*, 625 S.W.3d at 61; *Donavan*, 2025 WL 1403562, at \*14. A plaintiff can show the "qualification" element in one of two ways: (1) by proving that she can perform all essential job functions with or without modifications or accommodations or (2) by showing that some reasonable accommodation by the employer would enable her to perform the job. *Donaldson*, 495 S.W.3d at 437 (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996)); *see also Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at \*5 (Tex. App.—Austin Aug. 29, 2018, pet. denied) (mem. op.).

Courts determine whether a function is essential on a case-by-case basis, *see Adams v. City of Pineland*, No. 12-23-00289-CV, 2024 WL 2064384, at \*5 (Tex. App.—Tyler May 8, 2024, no pet.) (mem. op.); *Credeur v. Louisiana ex rel. Off. of Att'y Gen.*,

860 F.3d 785, 792 (5th Cir. 2017), and inquire whether it "bear[s] more than a marginal relationship to the job at issue," *see Avila*, 2018 WL 4100854, at *5 (first citing *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993); and then citing *Howard*, 429 S.W.3d at 790); *see also Wilkerson*, 2026 WL 202566, at *11, "such that a job is fundamentally altered if an essential function is removed," *see Credeur*, 860 F.3d at 792 (cleaned up). Employers are not required to "'reallocate essential functions' to accommodate an employee with a disability." *Wilkerson*, 2026 WL 202566, at *11 (quoting *Credeur*, 860 F.3d at 795).

Because the TCHRA expressly effectuates the ADA's anti-discrimination policies, *see* Tex. Lab. Code Ann. § 21.001(3); *Little v. Tex. Dep't of Crim. Justice*, 148 S.W.3d 374, 381–82 (Tex. 2004); *Univ. of Tex. v. Poindexter*, 306 S.W.3d 798, 807 n.7 (Tex. App.—Austin 2009, no pet.), in determining what is an essential function, we may consider the ADA's text:

> For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job[,]

42 U.S.C. § 12111(8). In addition to these considerations, courts frequently look to various non-exclusive factors, including (1) the employee's time spent performing the function, (2) the consequences of allowing the employee not to perform the function, (3) the work experience of persons holding the same or similar jobs, and (4) the terms

13

of any collective-bargaining agreement.[4] *See, e.g.*, *Adams v. City of Pineland*, No. 12-23-00289-CV, 2024 WL 2064384, at \*5 (Tex. App.—Tyler May 8, 2024, no pet.) (mem. op.) (citing *LeBlanc v. Lamar State Coll.*, 232 S.W.3d 294, 300 n.3 (Tex. App.—Beaumont 2007, no pet.)); *see also Credeur*, 860 F.3d at 792 (concluding that courts should "give the greatest weight to the 'employer's judgment'" because "[i]t is the only evidence the [ADA] requires [courts] to consider, absent a written job description").[5]

Turning to the specific issue of physical attendance, courts have historically agreed that being physically present at the workplace is an essential function of most jobs. *Credeur*, 860 F.3d at 793 (first citing *Hypes on Behalf of Hypes v. First Com. Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam) (collecting cases); and then citing *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc)); *Wilkerson*, 2026 WL 202566, at \*11 (applying *Credeur* to a warehouse worker). "This is especially true when the position is interactive." *Credeur*, 860 F.3d at 793.

As for in-person teaching positions, before the COVID-19 pandemic, courts routinely concluded that a teacher's physical classroom attendance was an essential function of in-person instruction. *See, e.g.*, *Preddie v. Bartholomew Consol. Sch. Corp.*,

---

[4]As both parties have acknowledged, there is no evidence of a collective-bargaining agreement, so this factor is inapplicable.

[5]Federal cases like *Credeur*—when consistent with the TCHRA and its interpretive precedents—may assist us in construing Texas law, but they do not bind us. *Tex. Tech Univ. Health Scis. Ctr. - El Paso v. Niehay*, 671 S.W.3d 929, 937 (Tex. 2023).

799 F.3d 806, 814 (7th Cir. 2015); *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1003 (7th Cir. 1998); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994); *Christensen v. Bd. of Trustees for Rock Valley Coll.*, No. 3:17 C 50255, 2020 WL 1275040, at *3 (N.D. Ill. Mar. 17, 2020); *Moore-Fotso v. Bd. of Educ. of Chi.*, 211 F. Supp. 3d 1012, 1025 (N.D. Ill. 2016); *Lane v. Prince George's Cnty. Pub. Schs.*, No. 11–cv–2088, 2013 WL 4541642, at *4 (D. Md. Aug. 26, 2013) (concluding that teacher was not a "qualified individual with a disability" when her doctor had not released her to work in the classroom).

Early in the COVID-19 pandemic, many schools—like UTA—temporarily moved to online classrooms for the safety and protection of students and faculty. After such schools resumed in-person instruction, courts have increasingly confronted the question presented here: whether a school's emergency decision to temporarily permit remote teaching during the pandemic's early phase, and the school's subsequent reversion to in-person instruction, altered the longstanding essential in-person function of the school's in-person teaching positions. *See, e.g.*, *Bodie-Jernigan v. Sch. Bd. of Broward Cnty., Fla.*, No. 24-12593, 2025 WL 2741931, at *3 (11th Cir. Sept. 26, 2025) (per curiam); *Ray v. Columbia Brazoria Indep. Sch. Dist.*, No. 24-20227, 2025 WL 1219191, at *3 (5th Cir. Apr. 28, 2025); *Smithson v. Austin*, 86 F.4th 815, 821 (7th Cir. 2023); *Dillard v. DePaul Univ.*, No. 20-CV-7760, 2026 WL 309657, at *16 (N.D. Ill. Feb. 5, 2026); *Jordan v. Sch. Bd. of Norfolk*, No. 2:22-CV-167, 2023 WL 5807844, at *8 (E.D. Va. Sept. 7, 2023); *Sarkisian v. Austin Preparatory Sch.*,

646 F. Supp. 3d 174, 184 (D. Mass. 2022), *aff'd*, 85 F.4th 670 (1st Cir. 2023); *Thomas v. Bridgeport Bd. of Educ.*, No. 3:20-CV-1487, 2022 WL 3646175, at *4 (D. Conn. Aug. 24, 2022); *Fisher v. Basehor-Linwood Unified Sch. Dist. No. 458*, 460 F. Supp. 3d 1167, 1192 (D. Kan. 2020), *aff'd*, 851 F. App'x 828 (10th Cir. 2021). Consistently, courts have answered no; physical attendance remains an essential function of the resumed in-person teaching positions. *See, e.g.*, *Bodie-Jernigan*, 2025 WL 2741931, at *3; *Ray*, 2025 WL 1219191, at *3; *Smithson*, 86 F.4th at 821 (holding that a teacher was not qualified under the ADA if she could attend in-person learning for only a quarter of the designated school day); *Dillard*, 2026 WL 309657, at *16 ("Plaintiff cannot establish that Defendant failed to provide her with reasonable accommodation where those accommodations included significantly decreasing, but not eliminating, her in-person teaching requirements."); *Jordan*, 2023 WL 5807844, at *8 ("[O]nce [defendant-employer] required students and employees to return for in-person instruction, [plaintiff-principal] was required to resume her job's essential functions as they were in the pre-COVID era." (quotations omitted)); *Sarkisian*, 646 F. Supp. 3d at 184 (concluding that physical presence was an essential function of teaching); *Thomas*, 2022 WL 3646175, at *4 ("[I]n-person instruction is an essential function of [the plaintiff's] job as a high school Spanish teacher."); *Fisher*, 460 F. Supp. 3d at 1192 (concluding that supervising students is an essential job function of a middle-school teacher).

The Fifth Circuit's analysis in *Ray* is instructive. 2025 WL 1219191, at *3–5. In that case, a school district closed its campuses in March 2020 in response to COVID-19 and finished the semester through a virtual-teaching model. *Id.* at *1. The following summer, the Texas Education Agency announced that it was safe to return to school campuses for in-person instruction during the 2020–2021 academic year. *Id.* Although the district allowed parents to decide whether their children would receive instruction in-person or remotely, it required teachers to report to campus. *Id.* Because of Ray's concerns about her health, she asked to "be separated from all the students" or "work from home." *Id.* The district informed her that she needed to be in her classroom with the students attending in person and informed her of the health precautions it was taking. *Id.*

But when the district's in-person classes resumed, Ray did not return to her classroom. *Id.* at *2. Instead, she started taking sick days until her leave ran out, and she never reported to work. *Id.* As a result, the district did not renew her contract, and she sued for disability discrimination. *Id.*

In considering whether Ray's attendance in her classroom was an essential function of her job as a classroom teacher, the court examined Ray's job description, which listed "classroom management" as one of her "major responsibilities and duties." *Id.* at *3. The court also relied upon *Credeur* and other authorities holding that in-person attendance is an essential function of being a classroom teacher. *Id.*

17

Ray argued that in-person attendance was not essential because the district had allowed teachers to work remotely at the pandemic's onset. *Id.* The court rejected this argument, quoting EEOC guidance on point:

> The fact that an employer temporarily excused performance of one or more essential functions when it closed the workplace and enabled employees to telework for the purpose of protecting their safety from COVID-19, or otherwise chose to permit telework, does not mean that the employer permanently changed a job's essential functions, that telework is always a feasible accommodation, or that it does not pose an undue hardship.

*Id.* (quoting *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, U.S. EEOC, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws# (last updated May 15, 2023)). The court concluded that the district's temporary "allowance of telework [did] not create a genuine dispute of material fact as to whether in-person instruction was an essential function of Ray's position as a teacher." *Id.* (citing *Jordan*, 2023 WL 5807844, at *11); *see also Dominguez v. Bd. of Educ. of Yonkers City Sch. Dist.*, No. 23 Civ. 2460, 2024 WL 3427217, at *6 (S.D.N.Y. July 16, 2024) (stating that the fact that a teacher "could perform his essential job functions while working remotely during the first phase of the COVID-19 pandemic . . . [did] not support his assertion that he could continue to perform his essential job functions" once "the District determined the return to in-person school was appropriate").

**B. Analysis**

We examine Dr. Esimai's two claims and conclude that the trial court should have dismissed both claims.

**1. Disability discrimination**

Regarding Dr. Esimai's disability-discrimination claim, UTA asserts that it demonstrated that an essential function of her in-person teaching position was that she be able to teach in person. UTA thus argues that the trial court should have granted its jurisdictional plea because Dr. Esimai failed to raise at least a genuine issue of material fact that she was qualified for the job. *See Alamo Heights*, 544 S.W.3d at 771 (citing *Miranda*, 133 S.W.3d at 221).We agree.

Although Dr. Esimai said that she did not have a written job description, and none of her employment contracts from 2019–2022 explicitly stated that UTA required her to teach in person, it is undisputed that for the first twenty years of her teaching career at UTA, Dr. Esimai exclusively taught her classes in person. COVID-19 was the sole reason for UTA's temporary move to online learning before its resuming all in-person teaching, and COVID-19 was the sole reason that UTA briefly permitted its faculty—including Dr. Esimai—to teach remotely.[6]

---

[6]We have evidence before us concerning only UTA's College of Business's Information Systems and Operations Management Department, and we have none regarding UTA's other departments or programs, including whether any of them implemented any ongoing use of fully remote or hybrid-learning options. Thus, our conclusions are limited to the facts before us, involving a department that was fully in

19

Before the pandemic, and briefly in fall 2021, Dr. Esimai taught in person. When UTA granted her first two COVID-19 accommodation requests, it did not even consider whether in-person teaching was an essential job function; it simply granted her requests as part of the "unique circumstances of the COVID-19 pandemic" as the school transitioned back to full in-person classrooms, which included a number of COVID-19 protocols. Once UTA ended those protocols and implemented full in-person teaching, in evaluating Dr. Esimai's third accommodation request, it determined that in-person teaching was an essential function of her job.

When a university offers fully in-person classroom instruction, having the teacher attend in person bears more than a marginal relationship to the job at issue. *See Wilkerson*, 2026 WL 202566, at *11; *Avila*, 2018 WL 4100854, at *5; *Howard*, 429 S.W.3d at 790. The teacher's physical attendance is fundamental to the in-person classroom model, and allowing remote teaching would fundamentally alter the job. *See Credeur*, 860 F.3d at 792. Thus, in this circumstance, where the university opted to not offer any remote options—and disallowed two other professors' similar requests to continue teaching online—we do give significant consideration to the employer's judgment that teaching in person was an essential function of Dr. Esimai's job. *See id.* We conclude that UTA established that in-person teaching was an essential function

person before the pandemic, briefly transitioned to an online-only format during the pandemic, and returned to 100% in-person learning after the pandemic.

of Dr. Esimai's teaching position, and once it did so, she had the burden to raise a genuine issue of material fact that she was qualified for the position, which she failed to meet. *See Alamo Heights*, 544 S.W.3d at 771 (citing *Miranda*, 133 S.W.3d at 221).

In her brief, Dr. Esimai points to the factor concerning the time she spent performing her job, *see Adams*, 2024 WL 2064384, at *5, and she states that "one can certainly ascertain how much time [she] spent teaching her classes," but she argues that UTA "offer[ed] no evidence as to how much in-class teaching made up [her] total job duties in her position." Her argument ignores the record and, in particular, the accommodation she had requested.

As part of her third accommodation request—submitted in June and again in August 2022—Dr. Esimai's doctor was asked, "What adjustments to the work environment or position responsibilities would enable the employee to perform the essential functions of the position?" In both 2022 submissions, the doctor wrote, "Allow the employee to teach and interact with her students [v]irtually or [r]emotely indefinitely."

She complains on appeal—without any summary-judgment evidence—that many of her "duties consisted of preparing her lectures, correcting exams, and responding to student inquiries. None of these functions must be performed in class." But she pointed to no evidence that UTA required her to prepare her lectures, correct exams, or respond to all student inquiries in the physical presence of her students. As UTA points out in its reply brief, "the amount of time that Dr. Esimai was expected

21

to spend teaching classes in person was 100% of the time," and she was able "to prepare and grade as she saw fit and in compliance with the UTA guidelines." The focus of the trial court was not on Dr. Esimai's non-teaching responsibilities; rather, she solely claimed that she could not teach in person and had requested to teach indefinitely in a remote format. That Dr. Esimai could perform her non-teaching responsibilities outside a classroom did not raise a fact issue about whether teaching in person was an essential function of her job or whether she was qualified for such a teaching position.

Dr. Esimai also argues that because UTA had permitted her to teach remotely during COVID-19, she was qualified to continue teaching her in-person class from home. This is the same argument that the teacher in *Ray* made. *See* 2025 WL 1219191, at *3. We agree with that court's reasoning about school employers who closed their schools during the pandemic's early uncertainties, temporarily allowed online teaching for the health and safety of faculty and students, and then resumed fully in-person instruction. *See id.*

Such action did not permanently change the essential functions of the teachers who taught fully in person before the pandemic and returned to do so again after the emergency had ended. *See id.*; *see also Bodie-Jernigan*, 2025 WL 2741931, at *3; *Smithson*, 86 F.4th at 821; *Dillard*, 2026 WL 309657, at *16; *Jordan*, 2023 WL 5807844, at *8; *Sarkisian*, 646 F. Supp. 3d at 184; *Thomas*, 2022 WL 3646175, at *4; *Fisher*, 460 F. Supp. 3d at 1192. Once UTA ended online learning and required its faculty and

22

students to resume in-person instruction, Dr. Esimai "was required to resume her job's essential functions as they were in the pre-COVID era." *See Jordan*, 2023 WL 5807844, at *8; *see also Dominguez*, 2024 WL 3427217, at *6.

Like the court in *Ray*, we agree with *Credeur*'s guidance that "an employee's unsupported testimony that she could perform her job functions from home does not create a genuine" issue of material fact. *See Ray*, 2025 WL 1219191, at *3 (quoting *Credeur* 860 F.3d at 793 (cleaned up)). Dr. Esimai's declaration that she had "successfully taught [her] courses online" during UTA's temporary COVID-19 in-person shutdown was not enough to warrant the trial court's denying UTA's Motion. *See id.*

In sum, UTA's prior allowance of telework did not create a genuine dispute of material fact about whether in-person instruction was an essential function of Dr. Esimai's position as an in-person professor. *See id.* When she claimed that she could no longer teach in person—and was only capable of teaching her classes from home—she was no longer qualified for the in-person classroom position. Thus, because she presented no evidence to raise a genuine issue of material fact that she was qualified to teach her in-person courses, the trial court erred by denying UTA's Motion and allowing Dr. Esimai's disability-discrimination claim to proceed. *See Alamo Heights*, 544 S.W.3d at 771 (citing *Miranda*, 133 S.W.3d at 221).

### 2. Failure to accommodate

On Dr. Esimai's separate claim that UTA failed to accommodate her when it would not permit her to teach remotely, we have explained above that she was not a qualified employee because she could not return to in-person teaching—an issue that overlaps with her disability-discrimination claim. *See* Tex. Lab. Code Ann. § 21.128(a) (stating employer violates TCHRA only if it fails to make a reasonable workplace accommodation for an "otherwise qualified" employee with a disability); *Donavan*, 2025 WL 1403562, at *14; *Mitchell*, 2024 WL 4629162, at *14; *Howard*, 429 S.W.3d at 789. Dr. Esmai thus failed to present sufficient evidence to raise a genuine issue of material fact that she could perform the "essential functions" of her in-person teaching job. *See id.*; *Donavan*, 2025 WL 1403562, at *14; *Mitchell*, 2024 WL 4629162, at *14; *Trevizo*, 697 S.W.3d at 276. Accordingly, the trial court erred by denying UTA's Motion and allowing Dr. Esimai's failure-to-accommodate claim to proceed. We sustain UTA's first issue.

## IV. Conclusion

Having sustained UTA's first issue, we need not reach its other issues. *See* Tex. R. App. P. 47.1. We reverse the trial court's order denying UTA's Motion on Dr. Esimai's disability-discrimination and failure-to-accommodate claims and render judgment dismissing those claims.

24

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered:  March 26, 2026